IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> CALEB A. ROOT, <br><br> Defendant. | No. 23-CR-4041-LTS-KEM <br><br> **REPORT AND RECOMMENDATION** |

Defendant Caleb A. Root moves to suppress statements he made during a traffic stop, arguing that officers violated his *Miranda*[1] rights. Docs. 26, 42. He also seeks to suppress evidence later seized from his vehicle. The Government resists. Docs. 33, 43.

I held a hearing on the suppression motion on March 15, 2024, at which Sioux City Police Officer Brian Smith and Lieutenant Dane Wagner testified.[2] Doc. 41. I also admitted the following exhibits into evidence:

- Defendant Exhibit A – Police report (Doc. 31) (sealed);
- Government Exhibit 1 – Officer Smith body camera video (Doc. 34); and
- Government Exhibit 2 – Lieutenant Wagner body camera video (Doc. 34).

I recommend **denying** the motion to suppress (Doc. 26).

### I. BACKGROUND[3]

Around 3:30 a.m., Officer Smith initiated a traffic stop of a truck pulling a trailer (both with Montana plates) after the truck cut through a gas station parking lot (illegally

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] At the time of the traffic stop, Lieutenant Wagner's rank was sergeant.

[3] These facts are taken from the body camera videos and the testimony at the suppression hearing.

using the parking lot as a thoroughfare). The trailer also had a taillight out. Officer Smith believed the truck had abruptly braked and cut through the parking lot to avoid driving by his marked squad car, which he found suspicious.

Officer Smith walked over to the passenger side window and asked, "How we doing?" He asked whether the driver, ultimately identified as Root, was just moving to town, and Root responded that he was headed to Montana. Root confirmed that he was alone in the vehicle. Officer Smith asked what was going on and explained that he had pulled Root over for using the parking lot as a thoroughfare. Root apologized, explaining that he was trying to find his Airbnb. Officer Smith asked where the Airbnb was located, and Root read the address from his phone, located in Burbank, South Dakota. Officer Smith noted they were currently in Sioux City, Iowa, and Root said Burbank was 9 miles away. Officer Smith said Burbank was a "long way away yet," and Root explained he had been at the strip club and had been driving around lost for two hours looking for the Airbnb (despite having directions on his phone). There are only two strip clubs in Sioux City, and they are both near the interstate; and to reach Burbank from Sioux City, the logical route is via the interstate. Root was in an area of town away from both the strip clubs and the interstate, far afield from the most likely path of someone traveling from the strip club to Burbank.

Officer Smith asked whether the truck belonged to Root, and he said it was his wife's truck, a company truck. Officer Smith asked whether he had a valid license, and Root said it was in his wife's name and gave his name as "John G—." Officer Smith asked again if he had a valid license. Root said it was somewhere in the truck and confirmed it was a Montana license. Officer Smith asked, "So you're going to the Airbnb?" Root confirmed he would sleep at the Airbnb and grab breakfast in the morning before heading home to Montana. Root provided the name of the business and denied staying in Iowa for work. At some point during their conversation, another officer arrived on the scene and stood near the driver's side window.

2

Officer Smith asked Root to spell his first and last name, and Root did so (for the John G. alias he had provided). Officer Smith then asked for his date of birth. Root said Officer Smith would have to look it up, indicating he had done nothing wrong and was scared. Officer Smith said he was just asking for Root's date of birth. Root said he needed to talk to his attorney because he had not done anything wrong. Officer Smith explained that because he had been pulled over for a traffic stop in Iowa, Root had to produce a driver's license or identify himself by name and date of birth. Root said he did not want to incriminate himself. Officer Smith asked how he would incriminate himself by providing his date of birth. They went back and forth, with Root refusing to provide his date of birth and Officer Smith continuing to ask, until Lieutenant Wagner arrived on the scene.

Lieutenant Wagner pulled his marked squad car in front of Root's truck. Thus, when Lieutenant Wagner arrived, there were two marked squad cars parked behind Root's truck, one squad car parked in front of his truck, and an officer outside both doors to the truck (the driver side and passenger side).

As Lieutenant Wagner approached, Officer Smith informed him that Root had been pulled over for using a parking lot as a thoroughfare and that he refused to provide his date of birth. Lieutenant Wagner asked Root why he would not tell law enforcement his date of birth. Root indicated he had had a few drinks and had been told not to answer any questions. Lieutenant Wagner asked Root to step out of the vehicle. Lieutenant Wagner explained that if Root did not provide his date of birth, their only other option would be to take him to jail. Root then relented, identifying himself under his true name and date of birth. He admitted that he did not have a valid license, that he had spent a lot of time in federal prison, and that there was an active warrant for his arrest in Colorado. Lieutenant Wagner asked Root how much he had drunk that night, and Root said five to six beers. Root explained that he had provided his wife's ex-husband's name in an attempt to avoid trouble, since the truck and trailer would "come back" to that name. Lieutenant Wagner asked about Root's travel plans and trailer contents; Root said

3

he had visited family and retrieved items from property he owned in Michigan, and he was transporting those items back to Montana, where he lived.

Lieutenant Wagner looked through the truck's windows with his flashlight and asked if Root had marijuana sitting out on his floor. Root admitted he did. Lieutenant Wagner informed him that marijuana possession had not been legalized in Iowa. Root suggested that prison had taken his life away from him, and Lieutenant Wagner responded that he needed to blame his actions, not law enforcement, for his incarceration. Officer Smith began handcuffing Root, placing him under arrest. Lieutenant Wagner advised Root of his *Miranda* rights, and the officers conducted a search of Root's vehicle.

## II. DISCUSSION

Under *Miranda*, a suspect subject to custodial interrogation must first be advised that he has the right to remain silent and the right to an attorney, and he must waive these rights before the interrogation can proceed.[4] Root argues that he was "in custody" for purposes of *Miranda* once Lieutenant Wagner arrived on the scene.

"[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"[5] "The . . . noncoercive aspect of ordinary traffic stops [means] . . . that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*."[6] Ordinary traffic stops are noncustodial because of their "presumptively temporary and brief" nature, as well as the "circumstances associated with the typical traffic stop":

> To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset

---

[4] 384 U.S. at 479.

[5] ***Berkemer v. McCarty***, 468 U.S. 420, 440 (1984) (quoting ***California v. Beheler***, 463 U.S. 1121, 1125 (1983)).

[6] ***Id.*.**

4

these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* . . . .[7]

Root points to three facts that he argues rendered the traffic stop custodial with the arrival of Lieutenant Wagner. Root notes that Lieutenant Wagner parked in front of his car, boxing Root's vehicle in and making it difficult for him to drive away. Root also argues that once three officers surrounded him on the scene, the atmosphere became police-dominated. Finally, Root argues that Lieutenant Wagner made a coercive statement when he said Root would be arrested if he did not provide his date of birth.

I do not find that these circumstances transformed the encounter from a temporary traffic stop to a formal arrest. Lieutenant Wagner's statement about being arrested was conditional, suggesting that Root's detention would be temporary and that he would be free to leave at the conclusion of the traffic stop, as long as he provided police with the information necessary to identify him. Although three officers were ultimately on the scene, this is not a case in which multiple officers were on the scene to start, causing a reasonable person to question whether the basis for the stop was truly traffic-related.[8]

---

[7] *Id.* at 437-39.

[8] *Cf. United States v. Thompson*, 976 F.3d 815, 820, 824 (8th Cir. 2020) ("agree[ing]" with defendant that he was in custody once asked to step out of the car during a traffic stop and subjected to *Terry* pat down, despite being told he was not under arrest, but ultimately finding statements were admissible under public-safety exception); *United States v. Thompson*, No. 18-cr-180-PAM-KMM, 2019 WL 2016797, at *18 (D. Minn. Jan. 7, 2019) (underlying report and recommendation notes that "[t]hree squad cars were on the scene very shortly after [the officer] initiated the stop," with "several armed officers at the scene as well as a police K-9," and that "[a] reasonable person who is informed that he has been stopped for overly tinted windows and a failure to display license plates does not expect such a strong law enforcement presence").

5

Here, additional officers arrived on the scene because Root refused to produce a driver's license or date of birth to identify himself, and a reasonable person would understand their presence as a natural consequence of failing to produce a means of identification (rather than as evidence that the nature of the stop was pretextual and not traffic-related). The arrival of a third officer did not render the traffic stop so "police dominated" that *Miranda* warnings were required—Root was still in public view, the officers were speaking congenially to him, and it was not clear that he would be prohibited from leaving if he cooperated with police and provided his date of birth. Although Root was not free to leave, nothing during the encounter prior to his formal arrest suggested that it was anything other than a temporary traffic stop. I do not find that circumstances transformed the traffic stop to custodial prior to Root's formal arrest.

Root argues that he invoked his right to counsel and right to remain silent prior to being read his *Miranda* warnings (and prior to being in custody). "Given that [he] was not 'in custody' . . . , his right to counsel under the Fifth Amendment [wa]s not implicated," and therefore, law enforcement were free to continue questioning him about his identity.[9] Even once Root was formally placed under arrest (and his *Miranda* rights attached), courts have held that a defendant cannot anticipatorily invoke *Miranda* prior to being in custody.[10]

Finally, Root argues that once advised of *Miranda*, he stated only "that he understood his rights," not that "he waived those rights." Doc. 26. "[C]ourts can infer

---

[9] *United States v. Muhlenbruch*, 634 F.3d 987, 997 (8th Cir. 2011); *accord United States v. Conrad*, No. 13-CR-2039-LRR, 2014 WL 1165860, at *5 (N.D. Iowa Mar. 21, 2014) (collecting cases); *Caldwell v. Warren*, No. 2:10-CV-11930, 2011 WL 379406, at *7-8 (E.D. Mich. Feb. 3, 2011) (same).

[10] *United States v. Wyatt*, 179 F.3d 532, 537-38 (7th Cir. 1999) ("Because [defendant] could not invoke his *Miranda* right to counsel when he was not in custody, . . . . the absolute bar announced in *Edwards* against resuming interrogation of a defendant who has invoked the right to counsel does not apply."); *Caldwell*, 2011 WL 379406, at *7-8.

6

a waiver of Miranda rights 'from the actions and words of the person interrogated.'"[11] "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions."[12] *Miranda* is not violated simply because Root did not affirmatively say he "waived" his rights.

Finally, even if Root's *Miranda* rights were violated, suppression of items seized from the truck would not be an appropriate remedy. The exclusionary rule does not apply to "physical evidence that is the fruit of custodial interrogation conducted without *Miranda* warnings."[13]

Root does not challenge the legality of the traffic stop, nor argue that he invoked his rights after his formal arrest. His arguments (frankly) almost rise to the level of frivolity. I recommend denying the motion to suppress.[14]

### III. CONCLUSION

I recommend **DENYING** Root's motion to suppress (Doc. 26).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule

---

[11] ***Berghuis v. Thompkins***, 560 U.S. 370, 387 (2010) (quoting ***North Carolina v. Butler***, 441 U.S. 369, 373 (1979)).

[12] ***Id.***

[13] ***United States v. Morgan***, 729 F.3d 1086, 1091 (8th Cir. 2013) (citing ***United States v. Patene***, 542 U.S. 630, 642-44 (2004) (plurality opinion); ***id.*** at 644-45 (Kennedy, J., concurring in the judgment)).

[14] Given my findings, I decline to address the Government's inevitable-discovery argument.

on the objections.[15] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[16] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[17]

    **DATED** April 8, 2024.

*Kelly K.E. Mahoney* (signature)
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[15] **LCrR 59**.

[16] *See* **Fed. R. Crim. P. 59**.

[17] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).